UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK JORDAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 21-cv-00614 (CKK) |
| ) | |
| ) | |
| US BUREAU OF PRISONS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Mark Jordan is in the custody of the Federal Bureau of Prisons ("BOP") and is currently, and at all times relevant to the Complaint ("Compl."), ECF No. 1, designated to the United States Penitentiary located in Tucson, Arizona ("USP Tucson"). He sues the BOP under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, seeking review of a prison disciplinary determination. Compl. at 1. BOP has filed a Motion to Transfer ("MTT"), ECF No. 10, this matter pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Arizona, which Plaintiff opposes, ECF No. 14 ("Opp'n").[1] For the reasons discussed below, BOP's Motion to Transfer will be granted and this matter will be transferred to the District of Arizona.

**I.    BACKGROUND**

---

[1]     On June 14, 2021, Plaintiff filed a Motion for Extension of Time, ECF No. 12, to file his Opposition, which he then filed on July 28, 2021, approximately a month and a half beyond the deadline. Plaintiff has shown good cause for an extension, namely, frequent prison-lockdowns and logistical issues arising from COVID-19 protocols at USP Tucson, as well as delayed receipt of BOP's Motion to Transfer. *See id.* at 1–2. Furthermore, BOP has not opposed this request for extension. Therefore, the Court will grant *nunc pro tunc* Plaintiff's Motion for Extension.

1

Plaintiff initiated this lawsuit on March 5, 2021, "seeking review of an agency decision" under the APA. Compl. ¶ 1. He asks this Court to declare and overturn "his prison disciplinary conviction for 'running a business' as arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, not in accordance with and without procedures required by law, and otherwise [based] upon factual lacking substantial evidentiary record support." *Id.* More specifically, he seeks to vacate and expunge a determination, resulting from a July 2019 hearing, and held by the Unit Discipline Committee ("UDC") at USP Tucson. *See id.* ¶¶ 21–7; *id.* at p. 8. Plaintiff was found guilty of the prohibited act of "conducting a business without authorization." *See id.* ¶¶ 10–24. He was sanctioned with a 120-day loss of commissary privileges. *Id.* ¶ 23. He contends that (1) the conviction lacked an adequate evidentiary basis (Claim I), (2) the conviction was obtained in violation of law because UDC members acted as their own witnesses and investigators (Claims II and III), and (3) UDC lacked statutory authority to impose any disciplinary sanction other than a loss of good-conduct time (Claim IV).[2] *See id.* at pp. 7–8.

As background, on July 15, 2019, USP Tucson prison guards executed a "shakedown" of Plaintiff's cell and confiscated various unopened food items and a notebook entitled "store," that "contained names and figures." *See id.* ¶ 10. Plaintiff maintains that all of these food items were, as far as he knows, properly purchased from the prison commissary by his cellmate, Nicholas Turning Bear ("Turning Bear"). *See id.* ¶¶ 10–13.

---

[2]   Plaintiff does not further expound upon this particular point and presents no arguments or facts in support of the claim. The Court notes that it has already fully addressed this argument in another matter recently filed by Plaintiff, *Jordan v. BOP*, No. 20-1478 (D.D.C. filed June 1, 2020), dismissed pursuant to Federal Rules 12(b)(1) and (b)(6) on September 13, 2021, *see* Memorandum Opinion, ECF No. 24, and Order, ECF No. 25, which the Court incorporates herein by reference, and therefore, need not readdress. That matter is currently on appeal. *See* Notice of Appeal (Oct. 24, 2021), ECF No. 26.

Plaintiff and Turning Bear were then summoned to the "USP Tucson lieutenant's office, where they were met by SIS Technician Anthony Gallion." *Id*. ¶ 13. Plaintiff contends that, at the meeting with Gallion, Turning Bear admitted that the food items and the "store" ledger solely belonged to him. *Id.* ¶ 13. Gallion then had Turning Bear formally acknowledge his responsibility by signing "BOP Form 402, Confiscation and Disposition of Contraband Form." *Id.* ¶ 14; *see* Compl. Exhibits ("Exs."), ECF No. 1-1, at Ex. A, at 3 (Form 402). According to Plaintiff, Gallion also "advised Turning Bear that he would not be receiving an incident report but would have to donate the [confiscated] property to the institution[.]" Compl. ¶ 14

According to Plaintiff, on the following day, July 16, 2019, he and Turning Bear "were again summoned to the lieutenant's office," and once there, "Lieutenant O. Lopez" informed them that they would each be receiving incident reports and would be charged with "violations of BOP prohibited act codes 305 (Possessing Unauthorized Items) and 334 (Conducting a Business Without Authorization)." *Id*. ¶ 16. Plaintiff and Turning Bear were confused and contested the issuance of these impending incident reports, given the contradictory information they had purportedly received the day before from Gallion. *See id*. Plaintiff explained to Lopez that he could not have plausibly had any involvement because "had only just recently been assigned to the cell [with Turning Bear] from the segregation unit." *See id.* ¶ 16. He also explained that "he had no excessive property or ledger and did not think it was a 'store.' " *Id.*

Nonetheless, Plaintiff "was assigned Incident Report #3279425, while Turning Bear was assigned Incident Report #3279426." *Id.* ¶ 18; *see* Compl. Ex. A at 1 (Turning Bear's Incident Report); Ex. B at 1 (Plaintiff's Incident Report). The incident reports are identical, providing a list of the confiscated "commissary items," and alleging that "both inmates appeared to be running a business with an excessive amount of commissary items . . . [that] could not be stored inside

their wall locker or issued storage bag," further evidenced by the ledger.  *See* Compl. ¶ 18 (citing Compl. Ex. A at 1; Compl. Ex. B at 1).  The incident reports also state that the "inmates denied ownership of the items found," Compl. Ex. A at 1; Compl. Ex. B. at 1, which Plaintiff contends contradicts Turning Bear's prior ownership admission to Gallion, and his execution of Form 402, *see* Compl. ¶ 17.

Thereafter, Plaintiff and Turning Bear had separate hearings.  *See id*. ¶¶ 18–24.  On July 17, 2019, UDC held a hearing for Turning Bear.  *Id*. ¶ 19.  According to Plaintiff, the UDC hearing officials attempted to pressure Turning Bear into implicating Plaintiff, but Turning Bear continued to take full responsibility for the food items and ledger, absolving Plaintiff of any participation.  *See id*.

Meanwhile, UDC's documentation indicates that, at his hearing, Turning Bear admitted to both his and, ostensibly, Plaintiff's involvement, testifying that "[y]es, we were running a store[,]" Compl. Ex. A at 2 (UDC Hearing Determination for Turning Bear); *see* Compl. ¶ 20.  Based on this admission, and in conjunction with the incident report, the confiscated food items and ledger, and prison trust fund account statements (which evidenced suspicious financial deposits), UDC found that Turning Bear was guilty of "prohibited acts of both codes 305 and 334, sanctioning him to 30 days commissary restriction."  *See id.*

Later that morning, UDC held Plaintiff's hearing.  *See* Compl. ¶ 21; Compl. Ex. B at 2 (UDC Hearing Determination for Plaintiff).  Plaintiff states that, "at the outset of the hearing," he requested to "call witnesses," more specifically, Turning Bear, but he was informed by the UDC hearing officials that witnesses could not be called at a UDC proceeding.  *See* Compl. ¶ 21.  Plaintiff now acknowledges that he was not, in fact, entitled to call witnesses.  *See id*. (citing 28 CFR 541.7) (other citation omitted).  At his hearing, Plaintiff again denied ownership of any of

4

the confiscated food items, and recounted Turning Bear's prior admissions of responsibility. *See id.* ¶ 22; Compl. Ex. B at 2.

Ultimately, UDC found that Plaintiff "committed the prohibited act of code 334, running a business without authorization, and sanctioned him to loss of commissary for 120 days," which Plaintiff contends has prohibited him from purchasing "items essential to his religious exercise." *Id*. ¶ 23; Compl. Ex. B at 2; *see* Compl. Ex. C at 1–3 (Plaintiff's Separate Administrative Complaints and Appeal in re: Denial of Religious Expression). UDC predicated its findings on Plaintiff's incident report, Turning Bear's admission (at his own hearing) that he and Plaintiff were "running a store," and trust fund accounting. *See* Compl. ¶ 24; Compl. Ex. B at 2. It does not appear that UDC ultimately pursued the other charge against Plaintiff, namely, "Code 305 (possessing anything unauthorized)." *See* Compl. ¶ 23; Compl. Ex. B at 2.

Plaintiff argues that there is no evidence in UDC's record to support its reliance on the trust fund accounting, and to the extent that the accounting is derived from "evidence the UDC obtained through independent investigation," he contends that UDC violated 28 CFR 541.7(b), which prohibits UDC members from acting as investigators." Compl. ¶ 25. He further challenges the legitimacy of UDC's determination, arguing that it had no right to rely on Turning Bear's testimony at a different hearing, because Plaintiff could not call him as a witness at his own. *See id*. ¶ 27. Moreover, Plaintiff maintains that Turning Bear's hearing admission makes the UDC hearing officials the sole *de facto* "witnesses" to Turning Bear's testimony, in contravention of 28 CFR 541.7(b). *See id*. ¶¶ 27, 29. Finally, Plaintiff denies that his incident report was incriminating or could serve as a basis for the UDC's findings, because he UDC "cleared [him] . . . of the Code 305 charge of possessing any unauthorized items (commissary/store items or ledger)." *Id*. ¶ 26. He seems to imply that the incident report pertains primarily to the alleged possession of

5

unauthorized commissary items, rather than the charge he was eventually convicted of, namely, running a store, *see id.*, though the Court notes that the incident report charges Plaintiff with both "Code 305" and "Code 334," *see* Compl. Ex. B at 1.

Thereafter, Plaintiff unsuccessfully pursued relief from UDC's determination through BOP's Administrative Remedy Program, *see id.* ¶¶ 28, 30, first through his Complex Warden at USP Tucson ("Warden"), *see* Compl. Ex. B at 3–8 (Plaintiff's Appeal Documents & Denial Determination from Appeal to Warden), then to Gene Beasley, the BOP Regional Director for the Western Region ("WXR"), *see id.* at 9–11 (Plaintiff's Appeal Documents & Denial Determination from Appeal to WXR) (located in Stockton, California), *see id.* at 8 (indicating that WXR is in Stockton), and finally, to National Inmate Appeals Administrator ("NIAA") located in BOP's Central Office in the District of Columbia, *see id.* at 12–14 (Plaintiff's Appeal Documents to BOP Central Office).[3]

## II.     STANDARDS

### A.  Venue for APA Claims

"APA and constitutional claims are governed by the general federal venue provision 28 U.S.C. § 1391," which applies to civil actions brought against the United States and its agencies, or its officials acting in their official capacity. *Colley v. James*, 254 F. Supp. 3d 45, 70–1 (D.D.C.

---

[3] Plaintiff attaches his initial Form and Memorandum (dated March 16, 2020) in support of his Central Office/NIAA appeal, Compl. Ex. B at 12–13, as well as subsequent correspondence (dated July 6, 2020) from Central Office/NIAA granting his request for additional time to submit arguments and documentation and providing him with a submission deadline of August 15, 2020. *id.* at 14.  He does not, however, submit a copy of his additional documentation, or more importantly, the final determination from the Central Office/NIAA regarding the challenged determination.  For the purposes of this Motion, and taking Plaintiff at his word, *see* Compl. ¶ 30 (attesting to full exhaustion), the Court assumes that he received a final Central Office/NIAA determination, however, the Court notes that under the APA, a "final agency action" is necessary prior to judicial review, *see* 5 U.S.C. § 704; *see also McCoy v. Cardamone*, 646 F. Supp. 1143, 1144–45 (D.D.C. 1986).

2017); *Poullard v. Federal Bureau of Prisons*, 535 F. Supp. 2d 146, 148–50 (D.D.C. 2008) (finding same).  Section 1391 holds that an action "may be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1).

### B. Motion to Transfer Venue

Federal venue statute, 28 U.S.C. § 1406(a),[4] requires that a district court "dismiss, or if it be in the interest of justice, transfer" a case, which is filed "in the wrong division or district." "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws[.]" *Id.* While this provision allows for dismissal of a case filed in the wrong venue, BOP has not requested dismissal, but instead seeks a transfer of this matter to the District of Arizona pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *Id*.

"Under Section 1404(a), the moving party bears the burden of establishing that transfer is proper." *Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303, 310 (D.D.C. 2015) (citing *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996)).  First, the moving party must show that "venue is proper in the transferee court," *Montgomery v. Barr*, 502 F. Supp. 3d 165, 173 (D.D.C. 2020), and if successful, transfer under Section 1404(a) is justified "[e]ven where

---

[4] "[T]he framework for assessing a transfer under § 1406(a) is essentially identical to that under § 1404(a)[.]" *Melnattur v. Citizen. & Immig. Srvs.*, No. 20-3013, 2021 WL 3722732, at *3 n.4 (D.D.C. Aug. 23, 2021).

a plaintiff has brought its case in a proper [transferring] venue." *Preservation Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 53 (D.D.C. 2012). Fundamentally, this question "turns on the general venue statute, 28 U.S.C. § 1391." *Melnattur*, 2021 WL 3722732, at *2 (citation and internal quotation marks omitted). Furthermore, "[w]hen the events occur in more than one district, a court can consider which jurisdiction has the stronger factual nexus to the claims." *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 102 (D.D.C. 2009) (citation omitted).

If the moving party meets this threshold, the Court then weighs 'a number of case-specific factors' to decide whether a transfer is warranted." *Id.* (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). These factors concern both private and public interests. *See Spotts v. United States*, 562 F. Supp. 2d 46, 52 (D.D.C. 2008). The private interest factors are (1) the parties' choices of forum, (2) where the claim arose, (3) the convenience of the parties and witnesses, including the availability of compulsory processes to compel the attendance of unwilling witnesses, and (4) "the ease of access to sources of proof." *Id.* (citations omitted); *SEC v. Page Airways*, 464 F. Supp. 461, 463 (D.D.C. 1978).

The public interest factors are (1) the transferee court's familiarity with governing law, (2) the respective congestion within the transferor and transferee courts' dockets, (3) "the local interest in deciding local controversies at home[,]" *Spotts* 562 F. Supp. 2d at 52–3, and (4) and any "other practical aspects of expeditiously and conveniently conducting a trial[,]" *Page Airways*, 464 F. Supp. at 463. "Courts do not apply these factors mechanically," *Montgomery*, 502 F. Supp. 3d at 174 (citing *Starnes v. McGuire*, 512 F.2d 918, 933 (D.C. Cir. 1974) (en banc)), and the Court has "discretion . . . to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness.' " *Stewart*, 487 U.S. at 29 (quoting *Van Dusen v.*

*Barrack*, 376 U.S. 612, 622 (1964)); *see Gulf Rest. Net.*, 87 F. Supp. 3d at 310–11 ("These factors are not statutory; rather, they are intended to elucidate the concerns implied by the phrase in the interest of justice.") (citation and internal quotation marks omitted).

The District of Columbia Circuit has also established additional "factors that generally will be relevant to a decision whether to transfer" a matter filed by a prisoner. *See Starnes*, 512 F.2d at 929. The "*Starnes* factors" are (1) the prisoner's difficulty in communicating with counsel, (2) the difficulty of transferring the prisoner, (3) the availability of witnesses and files, (4) where the prisoner's immediate custodian is located, (5) the speed of final resolution, and (5) whether the case involves a national policy issue that may require the testimony of policymakers. *Id.* at 928–32; *see also Pinson v. Dep't of Justice*, 74 F. Supp. 3d 283, 293 n.19 (D.D.C. 2014) (listing the *Starnes* factors); *Thomas v. United States*, 779 F. Supp. 2d 154, 158 (D.D.C. 2011) (same).

### III. DISCUSSION

BOP seeks transfer of this matter, contending that venue is proper in the District of Arizona under 28 U.S.C. §1391, because the crux of the Plaintiff's claims arise from challenges to actions and determinations rendered by officials and staff at USP Tucson. *See* MTT Memorandum ("MTT Mem."), ECF No. 10, at 5–6. The Court agrees that, aside from the brief involvement of the NIAA and WXR (the latter of which is, incidentally, not located in this District), every single occurrence giving rise to Plaintiff's claims occurred at USP Tucson, by individuals located at USP Tucson. Therefore, at the outset, the Court finds that this case could have been properly brought in the District of Arizona. *See Montgomery*, 502 F. Supp. 3d at 173. "Having established the propriety of venue" in the District of Arizona, "the Court now turns to whether it is in the interest of justice to transfer this case to either proposed of those courts." *Melnattur*, 2021 WL 3722732, at *4.

Plaintiff maintains that venue is "appropriate in this district under 28 USC [§] 1391 because it is the district in which the defendant resides." Compl. ¶ 4.  In opposition to transfer, he first argues that the District of Arizona is improper because, despite his incarceration there, "he is a resident of Pennsylvania," and that, in the near future, he may be transferred "to a prison with[]in 500 driving miles of his Pennsylvania residence as mandated by the First Step Act, 18 USC [§] 3621(b)." Opp'n at 2–3; *see* Plaintiff's Supplemental Exhibits ("Supp. Exs."), ECF No. 13, at 3–4 (Plaintiff's Separate Appeal Documents & Central Office/NIAA Denial Determination in re: Plaintiff's Request for Transfer to Lesser Security Prison closer to Pennsylvania).  Second, he argues that this matter should remain in this District because he is challenging a final agency action under the ADA, which he eventually exhausted through the BOP Central Office, located in the District of Columbia.  *See* Opp'n at 2, 5–6; *see also* Compl. Ex. B at 12–14.  Ultimately, the Court finds Plaintiff's arguments unpersuasive.

First, though a court gives some deference to a plaintiff's forum choice, it gives "substantially less deference when the forum preferred by" a plaintiff  "is not his home forum." *McGlamry v. Lappin*, No. 06-143, 2006 WL 1382185, at *2 (D.D.C. May 18, 2006) (citing *Piper Aircraft v. Reyno*, 454 U.S. 235, 255–56 (1981) and *Boers v. United States*, 133 F. Supp. 2d 64, 65 (D.D.C. 2001)).  The District of Columbia is not Plaintiff's home forum.  And, despite his arguments to the contrary, *see* Opp'n at 2–3, according to the law of the District of Columbia Circuit, for venue purposes, a prisoner "resides" where he is incarcerated.  *See In re Pope*, 580 F.2d 620, 622 (D.C. Cir. 1978) (per curiam) (citation omitted); *Void–El v. O'Brien*, 811 F. Supp. 2d 255, 260 (D.D.C. 2011); *Zakiya v. United States*, 267 F. Supp. 2d 47, 58–59 (D.D.C. 2003).  Therefore, Plaintiff is considered a resident of Arizona.

Additionally, though Plaintiff anticipated a potential transfer to a prison closer to Pennsylvania, the renewed consideration for his transfer was apparently conducted on or about July 28, 2021, *see* Opp'n at 2–3; *see* Supp. Exs. at 4, and to date, Plaintiff remains at USP Tucson. Even if Plaintiff was, in fact, transferred to a facility in or near Pennsylvania, he would still not likely be considered a resident of the District of Columbia.  And then even if he were, in fact, transferred to a prison *in the* District of Columbia, it would not necessarily make the District of Arizona any less appropriate for purposes of venue.  Regardless, these are all hypothetical situations, as Plaintiff remains at USP Tucson.

Second, and as noted by BOP, *see* MTT Mem. at 5–6, courts in this jurisdiction must examine venue "carefully to guard against the danger that a plaintiff might manufacture" it in the District of Columbia.  *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993).  By bringing suit against a federal agency, *see id.*, or by "recasting local determinations as 'broad national policy directives,' " *PSV Enters. LLC v. U.S. Citizen. & Imm. Srvs.*, No. 20-cv-2287, 2021 WL 2115251, at *3 (D.D.C. May 25, 2021) (quoting *EfficientIP, Inc. v. Cuccinelli*, No. 20-cv-01455, 2020 WL 6683068, at *3 (D.D.C. Nov. 12, 2020)), a plaintiff could attempt to bring a suit in the District of Columbia that should be pursued elsewhere.  "Many, if indeed not most," civil cases "filed by prisoners not confined in the District of Columbia and not sentenced here originally, will tend to involve factors that make transfer to the place of incarceration appropriate."  *Starnes*, 512 F.2d at 926.

Here, Plaintiff seeks review of a disciplinary determination rendered at USP Tucson and alleges that staff and officials at USP Tucson engaged in wrongdoing.  While Plaintiff may have exhausted, or attempted to exhaust, his appeal of that determination through BOP's NIAA/Central Office, the mere presence of an agency's headquarters in this District is not automatically enough,

standing alone, to necessitate venue here, because "he has not described any [] behavior emanating from BOP headquarters to invoke national policy." *Thomas*, 779 F. Supp. 2d at 159 (proposing transferring prisoner-plaintiff's remaining claims to his district of incarceration, pursuant to Section 1404(a), where the only connection to this District was plaintiff's administrative exhaustion through the BOP Central Office/NIAA); *see Montgomery*, 502 F. Supp. 3d at 176–78 (transferring prisoner-plaintiff's case pursuant to Section 1404(a), which included APA claims against the BOP, to her district of incarceration, and finding that "this is not a case that challenges far-reaching national policies that emanate from Washington, D.C. and belongs in this district. Instead . . . it is a local conditions-of-confinement case."); *see also Melnattur*, 2021 WL 3722732, at *2–3, *5–6 (explaining that transfer of an APA case, challenging a denial determination by United States Citizenship and Immigration Services, was warranted under Sections 1404(a) and 1406(a) because, while the agency itself is located in this District, the "underlying" "decision-making process" took place in the District of Nebraska).

If the Court were to predicate venue based on Plaintiff's proposed analysis, then not only would every single prisoner seeking review under the APA of any fully exhausted prison disciplinary determination be heard in this District, but any plaintiff seeking review of *any* fully exhausted APA claim would thus bring suit in this District. This is untenable. "[T]here is certainly no reason why all cases involving . . . a federal statute should be litigated in the District of Columbia." *Starnes*, 512 F.2d at 925 n.7. While undoubtedly some APA claims may be brought in this District by plaintiffs residing in other jurisdictions, once challenged, there commonly must be more of a connection to this District than the axiomatic denial of the third stage of an administrative appeal by the BOP Central Office. *See Montgomery*, 502 F. Supp. 3d at 175 (finding that not all APA cases, and not even all "national policy" cases may be automatically

heard in this District, and instead require a case-by-case determination) (citing *Starnes*, 512 F.2d at 928).

Moreover, in analyzing the applicable private and public interest factors, *see* MTT at 6–7; Reply at 2–4, the Court finds that transfer is warranted. The private interest factors weigh in favor of the District of Arizona. Plaintiff prefers this District, but that deference is diminished because he does not live here and "the relevant events occurred elsewhere." *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 71 (D.D.C. 1998) (citation omitted). BOP prefers the District of Arizona. While this is an APA case, and the majority of the information will likely be gleaned from the administrative record, it would be far more convenient for the parties to proceed in the District of Arizona, where Plaintiff is located. Furthermore, despite the fact that this case is brought pursuant to the APA, witnesses may be necessary, and additional claims may be explored, because Plaintiff alleges that UDC officials and other USP Tucson staff have either negligently or intentionally engaged in coercion, misrepresentation, and other misconduct, *see* Compl. ¶¶ 16–17, 19–22, 25–29, which has inevitably resulted in violation of his right to religious expression, *see id.* ¶ 23.

To that end, all of the UDC decisionmakers, the Warden and prison staff members, Turning Bear, and any other potential witnesses, are all located at USP Tucson. *See Poullard*, 535 F. Supp. 2d at 149–50 (transferring, pursuant to Sections 1404(a) and 1406(a), an APA case challenging disciplinary actions, filed by prisoner-plaintiff, to his district of incarceration due to "the likelihood that witnesses and relevant evidence are maintained at FCI Beaumont, and given the difficulty of transferring an incarcerated plaintiff for purposes of pursuing litigation[.]"); *see also McGlamry*, 2006 WL 1382185, at *2 (transferring APA case pursuant to Section 1404(a) where prisoner-petitioner sought injunctive relief and expungement of his disciplinary report by "challenging the

disciplinary hearing process and the BOP's failure to abide by its agreement . . . events [that] occurred at FCI-Jessup" and finding that "[d]ecisions on these issues would be in the authority and discretion of the Warden at FCI-Jessup. All of the relevant witnesses would be prison staff at that institution."). Last, the sources of proof and evidence would all be more accessible in the District of Arizona, where the cell-search was conducted, the charges were waged, the disciplinary hearings took place, the underlying challenged determination was issued, and where Plaintiff alleges that he continues to suffer resulting damages. *See id*.

The public interest factors also tip in favor of the District of Arizona. While both courts would be equally familiar with the governing law, *see In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987) (citation and alterations omitted) ("the federal courts comprise a single system in which each tribunal endeavors to apply a single body of law."), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989), and this Court cannot speak to congestion of the District of Arizona's docket, it must also recognize "the local interest in deciding local controversies at home[,]" *Spotts* 562 F. Supp. 2d at 52–3; *see also Gulf Rest. Net.*, 87 F. Supp. 3d at 313 ("In Administrative Procedure Act ("APA") cases, a defendant's choice of forum deserves "some weight" where the harm from a federal agency's decision is felt most directly in the transferee district.") (quoting *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 46–7 (D.D.C. 2006)).

Here, Plaintiff alleges that he was treated unlawfully and unfairly sanctioned by prison staff and the UDC at USP Tucson. Clearly, the District of Arizona would have a far more vested interest in the outcome of this matter, as the prison is located there. *See Gulf Rest. Net.*, 87 F. Supp. 3d at 316 ("The importance of respecting localized interests is equally applicable 'to the judicial review

14

of an administrative decision which will be limited to the administrative record.' ") (quoting *Trout Unlimited*, 944 F. Supp. at 19).

Finally, an analysis of the *Starnes* factors demonstrates that transfer is merited. Plaintiff is currently proceeding *pro se*. However, if he were to obtain or be appointed counsel, it would be considerably more difficult for him to communicate with an attorney in or near this District, when he could instead, if the case proceeds in the District of Arizona, make use of the resources there to plausibly find an attorney located far closer to USP Tucson.

Additionally, and as already noted, the Warden, prison staff, and UDC officials, are all located in Arizona, as are the original files and other possible witnesses. If, for whatever reason, Plaintiff's in-person court-attendance is required, it would be quite onerous to transport him across the country to this District, but to the contrary, would be far more efficient in the District of Arizona. Moreover, all of these factors bode well for the speed of resolution in the District of Arizona.

And once again, there is no indication whatsoever that this case involves "a national issue [in which] federal officials in the District of Columbia had significant involvement in the agency action." *Intrepid Potash–New Mexico, LLC v. U.S. Dep't of Interior*, 669 F. Supp. 2d 88, 96 (D.D.C. 2009). Plaintiff is fundamentally challenging a decision affecting the conditions of his confinement and his treatment at USP Tucson, "rather than a national policy with connections to this district." *Montgomery*, 502 F. Supp. 3d at 175. Indeed, no "evidence [was taken] from headquarters officials[,]" *id*. at 177 (citation and internal quotation marks omitted), and to the contrary, "this suit centers on claims *unique to*" Plaintiff, *id.* at 176 (emphasis in original), arising from "a decision that involved the exercise of discretion by the Warden" and the USP Tucson staff and officials, *id*. at 177 (citation and internal quotation marks omitted). Plaintiff is not challenging

BOP's statutory authority to promulgate a regulation or to enforce its policies, he is instead disputing his own disciplinary conviction and the alleged unlawful actions taken by USP Tucson staff in furtherance of same.

Put simply, "there is nothing in the record indicating that the parties or the facts at issue are connected to this district." *Colley*, 254 F. Supp. 3d at 74 (transferring APA matter pursuant to Section 1404(a) (citing *Miller*, 608 F. Supp. 2d at 102)). Based on the foregoing analysis, the Court finds that it is not only more convenient for this case to proceed in the District of Arizona, but it would also be in the interest of justice to transfer this matter to that jurisdiction. *See Ortiz-Contreras v. Holder*, 126 F. Supp. 3d 127, 131 (D.D.C. 2015) (transferring APA case pursuant to Section 1406(a) to plaintiff's district of incarceration, where plaintiff challenged his designation and the outcome of prison disciplinary proceedings, because the claims arose at his prison and the only connections to this District were (1) the inclusion of high-raking federal officials as defendants, (2) claims generally challenging BOP regulations, and (3) the plaintiff's appeal to the Central Office/NIAA); *Ballard v. Holinka*, 601 F. Supp. 2d 110, 121–23 (D.D.C. 2009) (transferring APA matter pursuant to Section 1406(a), filed by prisoner-plaintiff, to his district of incarceration because the events arose there, and his pursuit of grievances through the BOP's "Administrative Remedy Program . . . to their final stage, an appeal to the National Inmate Appeals Administrator," was not enough to establish venue in the District of Columbia).

### IV. CONCLUSION

For the reasons set forth above, BOP's Motion to Transfer is GRANTED and this matter shall be transferred pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Arizona. Per its request and for good cause shown, the Court also extends BOP's time to respond to Plaintiff's Complaint until 60 days after this case is docketed in the District of

Arizona, based on BOP's proffer that it will be represented by different counsel upon transfer and that counsel will need time to become familiar with the case. An Order consistent with this Memorandum Opinion will be issued contemporaneously.

Date:   February 25, 2022                    _____s/s_____
                                            COLLEEN KOLLAR-KOTELLY
                                            United States District Judge